**AMWEST SURETY INSURANCE COMPANY, Plaintiff-Appellant,**

v.

**REPUBLIC NATIONAL BANK, Defendant-Appellee.**

No. 91–2713.

United States Court of Appeals, Fourth Circuit.

Argued June 1, 1992.

Decided Oct. 1, 1992.

Jeff B. Slagle, Thompson & Slagle, Norcross, Ga., argued, for plaintiff-appellant.

Harry Augustus Swagart, III, Law Offices—Harry A. Swagart, III, P.A., Columbia, S.C., argued, for defendant-appellee.

Before WIDENER and NIEMEYER, Circuit Judges, and LEGG, United States District Judge for the District of Maryland, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

In this diversity case Amwest Surety Insurance Company seeks to recover from Republic National Bank, of Columbia, South Carolina, funds that Amwest erroneously overdrew under a letter of credit and

then returned with directions to "put [them] back into the ... Letter of Credit." Amwest claims that when Republic National accepted the returned funds but refused to honor a subsequent draft on them, it breached its obligations under the letter, committed fraud, or was unjustly enriched. As a defense Republic National asserts that Amwest had breached its statutory presentment warranty. *See* S.C.Code Ann. § 36–5–111(1).

On cross-motions for summary judgment, the district court ruled that Republic National had discharged its obligations under the letter of credit when it honored the first draft in the full amount of the credit, and that the bank did not need to refund the $122,000 which Amwest had returned to the bank attempting partial reestablishment of the letter of credit.

While we agree with the district court's conclusion that the bank properly discharged its obligations under the letter of credit and did not defraud Amwest, we reverse its order denying Amwest's claim for the $122,000 and direct summary judgment for Amwest on its claim of unjust enrichment.

I

To withstand a motion for summary judgment supported by affidavits, the non-moving party may not rest upon mere allegations or denials but must, by its "own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c) & (e)). The following facts are either expressly conceded by both parties or supported by affidavits or depositions submitted by one party without similarly supported rebuttal by the other party.

In the Spring of 1988, B & F Contractors, Inc., of Hilton Head, South Carolina, submitted the winning bid to perform excavation and land grading work on a highway which The Hardaway Company, of Savannah, Georgia, was constructing for the Georgia Department of Transportation. As a part of the agreement between B & F Contractors and The Hardaway Company, B & F Contractors agreed to obtain a payment and performance bond for the benefit of The Hardaway Company. Amwest was willing to provide the requested bond, but required, along with other conditions, that B & F Contractors obtain a letter of credit for the benefit of Amwest.

With the assistance of First Sun South Corporation, whose relationship to B & F Contractors is unclear from the record, B & F Contractors had Republic National issue an irrevocable letter of credit in the amount of $160,000, naming Amwest as the beneficiary. Dated July 21, 1988, the letter of credit provided,

We hereby authorize you [Amwest] to draw on Republic National Bank of Columbia, South Carolina up to an aggregate amount of $160,000 U.S. Dollars available by your drafts at sight in the event you deem it necessary by reason of your having executed bond(s) on behalf of B & F Contra[c]tors, Inc.

\* \* \* \* \* \*

We engage with you that all drafts drawn under and in compliance with the terms of this credit will be duly honored if presented at this office on or before 2/15/89 or any automatically extended date, as hereinbefore set forth. We confirm credit and hereby undertake that all drafts drawn and presented will be duly honored by us.

To fund the letter of credit, B & F Contractors executed a demand note for $160,000 payable to Republic National, guaranteed by First Sun South, and secured by an assignment of the proceeds of B & F Contractors' contract with The Hardaway Company. Following receipt of the letter of credit, Amwest issued the payment and performance bond to The Hardaway Company.

In March 1989, The Hardaway Company informed Amwest that B & F Contractors was behind in paying its suppliers, a situation that was threatening its ability to continue performance of its bonded contract.

After an investigation disclosed that B & F Contractors owed approximately $100,000 to its suppliers, Amwest determined that it would need to pay $38,000 immediately to certain suppliers to assure continued performance of the contract. It paid the $38,000 and looked to the letter of credit for reimbursement.

Mistakenly believing that the letter of credit authorized only drafts for its full amount, Amwest submitted the required documentation, including the original letter of credit, to Republic National on May 8, 1989, for the full $160,000. On the same day, the bank honored the draft, sending Amwest a check for the full amount. The next day, however, First Sun South, a guarantor of B & F Contractors' note, complained to Amwest that it had expected the draw to be only $38,000. Amwest called Republic National in an effort to reduce the amount of its draw, but the call was not returned. Amwest then sent Republic National a letter dated May 31, 1989, accompanied by a check in the amount of $122,000, explaining that the check was "to be put back into the ... Letter of Credit," because the claims against the bond had "so far not exceeded the amount of $38,000."

First Sun South, meanwhile, told Republic National that Amwest was returning the $122,000 to reduce the amount due on B & F Contractors' note to the bank. When the check arrived, the bank cashed it and, without Amwest's knowledge, applied the funds to the outstanding balance on the note. Several months later, on August 2, 1989, when B & F Contractors' defaults had continued, Amwest submitted documentation for a second draw under the letter of credit for $122,000, but Republic National refused to honor it, asserting that the letter of credit had been extinguished when the bank honored the first draft in May for the full value of the credit.

Amwest sued Republic National, claiming breach of express and implied contracts, fraud, unjust enrichment, and bad-faith litigiousness. The district court dismissed the counts of fraud and bad-faith litigiousness for failure to state a claim, and, ruling on cross-motions for summary judgment on the remaining counts, it rejected Amwest's other claims, directing judgment for Republic National. Amwest appealed, but abandoned its claim for bad-faith litigiousness.

## II.

Amwest's contractual arguments are based upon the letter of credit established by B & F Contractors and issued by Republic National in Amwest's favor. It contends that Republic National breached its obligations under the letter of credit when it refused to honor Amwest's August draft. The bank contends that its obligations under the letter of credit had been fully discharged when Amwest drew down the full amount of the credit in May.

Letters of credit have long been used to facilitate the financing of commercial transactions between buyers and sellers by providing a certain and reliable means to ensure payment for goods delivered or services rendered. As elsewhere, in South Carolina, whose law governs this diversity case, a letter of credit is a tripartite arrangement under which one party establishes a credit, usually at a bank, on which it authorizes a third party to draw, provided certain conditions are met. The bank, as a mere stakeholder of the credit, issues a letter to the third party (known as the beneficiary) confirming the credit and stating the conditions for any draw to be made against it. In essence, the bank's promise to pay the beneficiary upon the beneficiary's timely presentation to the bank of documents conforming to the conditions delimited in the letter replaces the promise of the party which established the credit. *See Airline Reporting Corp. v. First Nat'l Bank,* 832 F.2d 823, 826 (4th Cir.1987).

The virtues of letters of credit are their simplicity, reliability, and predictability, all of which depend upon the limitation of the issuer's duties to the ministerial application of a letter's terms. *See Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 236 (5th Cir.1983); *see also Courtaulds North America, Inc. v. North Carolina Nat'l Bank,* 528 F.2d 802, 805 (4th Cir.1975) (is-

suer's "duties and liability are governed exclusively by the terms of the letter"). Thus under the Uniform Commercial Code, which South Carolina has adopted, in addition to the ordinary duties of a bank, an issuer is only obliged (1) to examine carefully documents presented by the beneficiary for compliance with the terms of the letter of credit and, absent a facial defect, (2) to honor the draft if the documents do comply—regardless of whether the underlying contract between beneficiary and customer has, in fact, been performed, and without assuming any liability if the documents wrongly assert that it has. S.C.Code Ann. §§ 36–5–109(2) & 36–5–114(1). Correspondingly, duly honoring a draft discharges the issuer's obligations "pro tanto," S.C.Code Ann. § 36–5–108(3)(a), and, unless otherwise agreed, entitles the issuer to "immediate reimbursement" by the customer of funds paid. S.C.Code Ann. § 36–5–114(3) & South Carolina Reporter's Comment.

■ A strict application of the South Carolina Code to the undisputed facts of this case reveals that Republic National met its obligations to Amwest under the letter of credit established by B & F Contractors for Amwest's benefit. Neither party disputes that Amwest's $160,000 draft on May 8, 1989, accompanied by a cover letter stating that claims had been made against B & F Contractors' bond complied with the terms of the letter of credit and that Republic National properly honored the draft with a check in the same amount. In doing so, the bank met its statutory obligation to honor facially complying drafts. *See* S.C.Code Ann. § 36–5–114(1). Since the amount paid was the full amount authorized by the letter of credit, Republic National was not obliged to honor any future drafts under the letter. *See* S.C.Code Ann. § 36–5–108(3)(a) (honor discharges issuer's obligations "pro tanto"). Consequently, the bank's dishonor three months later of Amwest's draft for $122,000 did not violate the letter of credit because, in effect, the letter had been discharged by payment on the first draft in the full amount authorized by the letter of credit.

Amwest contends, however, that the draft of May 8 was but the first half of a two-part transaction: The request for $160,000 on May 8 and the return of $122,000 on May 31, more than three weeks later, constituted a single draft of only $38,000 under the $160,000 letter of credit. Consequently, it argues, Republic National's dishonor of its draft in August 1989 for the remaining $122,000 breached the express contract created by the letter of credit. We cannot accept this attempt to avoid the plain language of the statute defining Republic National's obligations. Allowing beneficiaries to alter, after the fact, the amounts explicitly requested in a facially complying draft would undermine the virtues of transparency and mechanical predictability upon which users of letters of credit rely. Moreover, as may have occurred in this case, a beneficiary's later attempt to "put back" part of a facially complying draft honored by the issuer may arise out of a dispute concerning the accuracy of the assertions in the draft about performance of the underlying contract between beneficiary and customer. Requiring the issuer to treat returned funds as reducing the amount drawn by the initial draft would thus violate the cardinal principle that the issuer of a letter of credit "is not to be embroiled in disputes between the buyer and the seller." *Courtaulds North America, Inc.,* 528 F.2d at 805.

■ Alternatively, Amwest contends that even if the letter of credit was discharged at the time of the first draft, it was reinstated to the extent of $122,000 when Amwest sent Republic National a check for $122,000 along with directions to "put [it] back into the ... Letter of Credit," an offer the bank accepted by cashing the check without further response. We must also reject this argument. There is no evidence that B & F Contractors consented to either a modification of the original letter of credit or the creation of a new one. When rights are established under an irrevocable letter of credit, any modification to allow return of funds and reinstatement of payment obligations after statutory discharge requires the consent of the

parties, *see* S.C.Code Ann. § 36–5–106(2), unless, perhaps, there was a finding that the discharge was the result of a clerical error. Similarly, although the South Carolina Code does not explicitly address the subject, it is self-evident that all parties' consent would also be required to create a new letter of credit even if it was under the terms of the original, since any such new letter of credit would impose new, albeit similar, obligations. *See* S.C.Code Ann. § 36–5–106 & South Carolina Reporter's Comment. Because B & F Contractors consented only to the original letter of credit, which did not provide for Amwest to reinstate it some three weeks after its discharge, Amwest's return of some of the funds it drew cannot be considered to have obligated the bank to honor a later draft under the letter of credit.

### III

 The district court also properly dismissed Amwest's assertion of fraud for failure to state a claim. To state a claim of fraud in South Carolina, the plaintiff must allege:

> (1) a representation; (2) falsity; (3) its materiality; (4) knowledge of the falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance upon the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Moorhead v. First Piedmont Bank & Trust Co.*, 273 S.C. 356, 256 S.E.2d 414, 416 (1979). Amwest contends that Republic National's cashing of Amwest's $122,000 check accompanied by directions that the funds "be put back into the ... Letter of Credit" constituted a false representation that the bank would reinstate the letter of credit. Even assuming that silence under these circumstances can constitute a fraudulent misrepresentation of fact, *cf. Gardner v. Nash*, 225 S.C. 303, 82 S.E.2d 123, 127 (1954) (silence while owner explained to third-party bidders at forced auction that defendant would bid for him, leading to low winning bid by defendant, who then re-

fused to give property to owner), Amwest failed to allege that it relied upon this silence in any way. Amwest's delivery to the bank of the $122,000 preceded the silence, and so could not constitute reliance. Nor could any payments by Amwest on claims brought after this event under B & F Contractors' bond constitute reliance, since the obligation to make them arose upon issuance of the bond, before Republic National's silent cashing of Amwest's check. Without reaching the question of whether other elements of the tort were proved, we are satisfied that the district court properly dismissed, for failure to state a claim, Amwest's allegations of fraud.

### IV

While the district court's rulings on Amwest's claims of breach of express and implied contract based on the letter of credit and its fraud claim were proper, we conclude that the district court erred in granting summary judgment against Amwest on its claim for restitution of the $122,000 it gave Republic National.

In South Carolina, " 'the object to be attained in proceedings for restitution is the prevention of unjust enrichment of defendant and the securing for plaintiff of that to which he is justly and in good conscience entitled.... [I]f one obtains the property or the proceeds of property of another, without a right to do so, restitution in a proper case can be compelled.' " *Harper v. McCoy*, 276 S.C. 170, 276 S.E.2d 782, 783–84 (1981) (quoting 77 C.J.S. *Restitution* at 322–323). Courts thus require

> (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by defendant of the benefit under conditions that make it inequitable for him to retain it without paying its value.

*Ellis v. Smith Grading & Paving, Inc.*, 294 S.C. 470, 366 S.E.2d 12, 15 (Ct.App. 1988).

Republic National does not dispute that it received $122,000 from Amwest, accompanied by a letter instructing the bank to

put the funds "back into the ... Letter of Credit," then retained the funds despite a subsequent demand for their return, in the form of a draft nearly identical to a previous one which the bank contends fully complied with the terms of the letter of credit. If the funds Republic National received from Amwest belonged to Amwest, then these undisputed facts constitute unjust enrichment.

Republic National argues, however, that the money was not Amwest's to begin with, but belonged instead to the bank, and so the bank received no inequitable benefit when Amwest returned it. According to Republic National, although the original draft *facially complied* with the terms of the letter, Amwest had not *in fact* "deem[ed the draft] necessary by reason of [Amwest's] having executed bond(s) on behalf of B & F Contra[c]tors, Inc.," and thus it had violated its statutory warranty "to all interested parties that the necessary conditions of the credit [had] been complied with." S.C.Code Ann. § 36–5–111(1).

### A

■ No court in South Carolina has interpreted this warranty provision of Article 5 of the U.C.C., and the commentary of the official reporter and South Carolina's reporter do little more than reiterate the language of the provision. *See* S.C.Code Ann. § 36–5–111(1), Official Comment & South Carolina Reporter's Comments. Moreover, few other courts have considered the provision.

The courts that have addressed the issue agree that, once an issuer pays a draft on a letter of credit, it becomes an "interested party" able to avail itself of the beneficiary's warranty under Article 5. *See, e.g., Pubali Bank v. City Nat'l Bank,* 676 F.2d 1326, 1329 n. 5 (9th Cir.1982). Courts differ, however, on what the beneficiary actually warrants to an issuer. Some have held that "a beneficiary warrants to the issuing bank the truth of the statements necessary to a draw on the credit." *Mellon Bank, N.A. v. General Elec. Credit Corp.,* 724 F.Supp. 360, 363 (W.D.Pa.1989); *see also Sun Marine Terminals, Inc. v. Artoc*

*Bank & Trust, Ltd.,* 797 S.W.2d 7, 11 (Tex. 1990); *Brown v. United States Nat'l Bank,* 220 Neb. 684, 371 N.W.2d 692, 701 (1985) (assuming that the beneficiary warrants that asserted facts are true); *Pubali Bank,* 676 F.2d at 1329 (same); John F. Dolan, *Letters of Credit, Article 5 Warranties, Fraud, and the Beneficiary's Certificate,* 41 Bus.Law. 347, 349 (1986). But others have held that the beneficiary warrants only the genuineness of documents and signatures submitted with a draft and "that the documents do strictly comply with the terms of the letter of credit." *Delta Brands, Inc. v. MBank Dallas, N.A.,* 719 S.W.2d 355, 359 (Tx.Ct. App.1986), *implicitly overruled by Sun Marine Terminals v. Artoc Bank & Trust,* 797 S.W.2d at 11. *Compare Philadelphia Gear,* 717 F.2d at 238 (5th Cir.1983) (considering knowing tender of drafts not complying with conditions of letter of credit to violate U.C.C. § 5–111(1), La.Rev.Stat. § 10:5–111), *with* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 19–12, at 11 (3d ed. Supp.1991) (noting "confusion" and "frightening implications" of expansive interpretation of beneficiary's warranty).

We think that the latter understanding of the beneficiary's warranty is the correct one, and we therefore hold that the beneficiary of a letter of credit, when drawing on the credit, only warrants to the bank that the presenting documents are genuine and comply with the terms of the letter of credit. In other words, the beneficiary only promises that the bank will not be failing in its duty to its customer by paying on the draft. We conclude that this result is required for several reasons.

First, a careful reading of the statute creating this warranty reveals that it is "the necessary conditions *of the credit*" that the beneficiary warrants "have been complied with." S.C.Code Ann. § 36–5–111(1) (emphasis added). Elsewhere the Code uses nearly identical language to define letters of credit, *see* 36–5–103(1)(a) ("engagement ... that the issuer will honor drafts ... upon compliance with the conditions specified in the credit"), and to

delimit the issuer's obligation to honor drafts, *see* S.C.Code Ann. § 36–5–114(1) ("issuer must honor a draft ... which complies with the terms of the relevant credit"). We think there can be no doubt that the conditions and compliance referred to in § 36–5–111(1) are the same. On the one hand, then, the most natural reading of this language is that the beneficiary warrants that its draft complies with the conditions listed in the letter of credit—in the usual case, that documents required to be presented have been presented and statements required to be made have been made. On the other hand, only if the list of conditions in a letter of credit includes one of veracity can one say that a condition has not been complied with when an assertion by the beneficiary that is required by the letter of credit turns out to be false. Consequently, since only very few letters of credit include conditions of veracity, the general conclusion that any assertions required by a letter of credit must also be true in order to comply is not supported by the language of the Code.

Second, and more important, interpreting the beneficiary's warranty to allow issuers to recover funds they have paid in honoring a complying draft based on the veracity of included statements conflicts with the independence principle—that, to render certain and predictable the beneficiary's access to the credit, the issuer must be obliged only to examine for strict compliance with the terms of the letter and not to investigate any underlying dispute between the parties. Since most assertions of fact required by letters of credit concern the performance of the underlying contract between the beneficiary and the customer, allowing the issuer to recover funds paid on a draft because of the falsity of such assertions amounts to allowing the issuer to recover because of nonperformance of the underlying contract. This interpretation would undermine "the intermediary character of the persons moving the documents from the beneficiary to the customer," S.C.Code Ann. § 36–5–111(1), Official Comment, and transform the issuer into a third party meddling in the underlying contractual relations. While it has been ar-

gued that letters of credit are used merely to ensure that beneficiaries have ready access to the money during any dispute about the underlying contract, *see Mellon Bank*, 724 F.Supp. at 365, that argument cannot be extended to enable someone other than the customer to raise such a dispute. But, in the eyes of the beneficiary, that would be the result of a warranty of truthfulness. The issuer would also be able to avoid the statutory bar to asserting the beneficiary's nonperformance of the underlying contract as a defense to a beneficiary's draw on a letter of credit in the absence of a facial defect. *See* S.C.Code Ann. § 36–5–114. The beneficiary loses the benefit of the letter of credit if the issuer can circumvent the independence principle and the statutory requirement to pay regardless of performance on the underlying contract simply by paying the draft and then seeking return of the money on a claim that the beneficiary breached its underlying contractual obligations to the customer.

Finally, rejecting the view that beneficiaries warrant the truth of statements required to draw on a letter of credit would not render the warranty provision nugatory, as one court has argued. *See Mellon Bank*, 724 F.Supp. at 365. The obligation of customers to reimburse issuers for honoring drafts only arises for drafts that comply. *See* S.C.Code Ann. § 36–5–114(3). Consequently, under our understanding, the beneficiary's warranty protects the issuer against the customer's refusal to reimburse because the honor was wrongful, despite the issuer's good faith effort to determine that the documents presented comply. *See* S.C.Code Ann. § 36–5–109(1); *see also* S.C.Code Ann. § 36–1–203 (general obligation of good faith in execution of duties under the U.C.C.). Nor do issuers need a warranty that all statements by the beneficiary in an otherwise complying draft are truthful, regardless of whether the letter of credit expressly requires veracity, for they already have the right under § 36–5–114(3) to reimbursement from the customer for honor of facially complying drafts. The possibility that the customer may be *unable* to pay is the risk the issuer

assumed when it established the credit for its customer.

█ We conclude, therefore, that by warranting that "the necessary conditions of the credit have been complied with" under § 36-5-111(1), the beneficiary of a letter of credit only warrants that its draft complies with the terms of the letter of credit, and not that any statements it made to comply with the letter are truthful, unless truthfulness itself was a term of the letter of credit.

█ Returning to the case at hand, we find that this conclusion disposes of Republic National's defense to Amwest's claim for restitution. As mentioned, Republic National concedes that it *correctly* honored the initial draft for $160,000. Consequently, it does not dispute that Amwest complied with the terms of the letter of credit, and its assertion that Amwest violated its warranty must be rejected. Because Amwest did have a right to the $122,000 it sent to Republic National, the bank was unjustly enriched when it cashed the check, applied the proceeds to a liability to which it was exposed, and refused to return the money under the conditions Amwest indicated.

## B

█ Even if we were to accept the contention that the beneficiary does warrant under § 36-5-111(1) that assertions it makes in compliance with the terms of the letter of credit are true, Republic National's assertion of a breach of that warranty in this case is not an adequate defense to Amwest's equitable claim for restitution. Amwest's alleged breach is that, when submitting the first draft for $160,000, it had not, in fact, deemed any more than $38,000 necessary by reason of the bond it had issued for B & F Contractors. Republic National's view is that its payment of the facially complying draft for the full amount of the letter of credit discharged all of its obligations to Amwest and, when Amwest returned the amount in excess of that justified by Amwest's warranty, the bank had the right to dispose of the funds as it saw fit. We cannot accept this view because it grants Republic National a windfall.

The windfall is most easily recognized by considering the position Republic National would be in if Amwest had not erroneously demanded more than it deemed necessary—and Republic National has submitted no affidavit, deposition, or other rebuttal contradicting Amwest's affidavit and deposition testimony that it was merely an error. Without the error, Amwest would have submitted a draft identical to the one it sent, just for $38,000. Since this first draft concededly complied with the terms of the letter of credit, Republic National would have paid Amwest $38,000, and would have retained the remaining $122,000, leaving the bank obliged to honor future complying drafts up to $122,000. If Republic National's position is accepted, however, it may retain the $122,000 without the continuing obligation to honor future complying drafts up to that amount. The avoidance of this continuing obligation would constitute a windfall to the bank.

That Amwest's alleged breach of warranty under § 36-5-111(1) coincidentally resulted in discharge of Republic National's payment obligations under § 36-5-108(3)(a) does not alter the equities of this case. Had Republic National sued Amwest for breach of warranty by demanding more than was necessary to satisfy the B & F Contractors bond, rather than resort to self-help by putting the excess returned by Amwest to uses other than those required by Amwest, the proper remedy would have been return of the excess funds to B & F Contractors, subject to a set-off to protect Amwest's ongoing rights under the letter of credit. For there is no indication in the Code that a breach of the beneficiary's warranty itself *extinguishes* the letter of credit, and Amwest's breach damaged the bank only to the extent that it paid *more* than it agreed to in extending the letter of credit. There is no reason to allow Republic National to benefit from Amwest's error by allowing it to avoid paying sums it *had* agreed to pay.

To avoid a windfall to Republic National, even if Amwest is considered to have breached its warranty when submitting the original draft for $160,000, Republic National's right to the $122,000 returned by Amwest must be recognized as conditional upon subsequent presentation of further drafts complying with the terms of the letter of credit, as Amwest indicated by requesting that the funds "be put back into the ... Letter of Credit." Consequently, when the bank refused Amwest's facially complying draft of August 2, 1989, it converted the windfall and its acceptance of Amwest's returned money into unjust enrichment.

While the record is not adequate to conclude that Amwest's facially complying draft of August 2, 1989, for $122,000 did not also breach the warranty that Amwest in fact deemed the draft necessary, there is ample support in the form of affidavits by Amwest's investigating attorney in Georgia that Amwest thought its liability under the B & F Contractors bond exceeded the total value of the letter of credit within a few months thereafter.* Amwest would be fully justified in deeming another draft for $122,000 necessary. Consequently no purpose, other than delay, would be served if a court sitting in equity now required Amwest to resubmit its draft for $122,000.

In summary, we conclude that Amwest did not breach its warranty as a beneficiary, so as to preclude restitution of funds it had given Republic National subject to the condition that Amwest have access to them as if under the letter of credit discharged by the initial complying draft. Even if Amwest were held to have breached its warranty, however, the coincidental discharge of the letter of credit notwithstanding, Republic National's resort to self-help in enforcing Amwest's warranty as a beneficiary resulted in the bank's unjust enrichment when it refused to honor Amwest's

subsequent facially complying draft in accordance with the conditions under which Amwest returned the erroneous excess of $122,000 to the bank. Under the undisputed facts, therefore, Amwest deserved restitution of the $122,000 it gave Republic National, and summary judgment should have been granted for it, not Republic National.

## V

There being no dispute about any material fact and Republic National being entitled to judgment on Amwest's claims of express and implied contract and of fraud, we affirm summary judgment on these claims. Because Amwest deserved restitution, however, we reverse summary judgment for Republic National on Amwest's claim of unjust enrichment, and we remand with the direction that the district court enter summary judgment for Amwest on this claim in the appropriate amount.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

* Republic National's objection that the affidavit of Amwest's attorney about what Amwest knew and did must be disregarded because the statements made were not within his personal knowledge is wholly without merit. Not only did the sworn affidavit include a declaration that the facts contained therein "are known to

Affiant personally and directly," but a supplemental affidavit explained that he and another attorney in his firm were the only "field personnel" investigating the problems concerning the B & F Contractors bond and were the conduit for all of the information upon which Amwest acted.